**Byrd V. FURLONG and Helen Furlong, Plaintiffs-Appellants,**

v.

**Dr. James M. STOKES, Defendant-Respondent.**

No. 53125.

Supreme Court of Missouri, Division No. 2.

May 13, 1968.

Guilfoil, Symington, Montrey & Petzall, John P. Montrey, St. Louis, for appellants.

Norris H. Allen, Anderson, Gilbert, Wolfort, Allen & Bierman, St. Louis, for respondent.

RICHARD C. JENSEN, Special Judge.

This is an action brought by plaintiffs in two counts. Count I sought damages of $75,000.00 on behalf of Byrd V. Furlong (referred to herein as Furlong) for personal injuries, and in Count II Helen Furlong sought damages of $25,000.00 for injuries to her husband. At the close of the plaintiffs' case, the Trial Court sustained defendant's motion for a directed verdict, and, thereafter, plaintiffs' motion for a new trial was overruled. Plaintiffs, in their appeal, contend that there was substantial evidence of negligence and causation to submit both counts to the jury.

It is a well established rule in our Appellate Courts that in determining whether or not a plaintiff has made out a factual issue for consideration by a jury we must view the evidence in the light most favorable to the plaintiff, giving plaintiff the benefit of all legitimate inferences to be drawn therefrom. Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91; Steele v. Woods, Mo., 327 S.W.2d 187. This requires a review of the evidence and also the pleadings in the case.

Plaintiffs allege in their petition that the defendant prescribed and performed a left femoral saphenous bypass for and on Furlong; that during the operation, defendant negligently allowed and permitted a hot lamp to shine on the inside of the left knee of Furlong, resulting in a burn about his left knee.

The operation was performed at Barnes Hospital by the defendant, a licensed doctor of medicine, specializing in surgery. He was assisted in the operation by Dr. Robert D. Kane, surgical resident, and Dr. Bernard Jaffee, intern. Also present during the operation were the anesthesiologist resident, the anesthesiologist, the circulating nurse and the scrub nurse.

There were in Barnes Hospital at the time of the operation 14 rooms in which operative procedures could be conducted. Such nurses and technicians as are necessary are assigned by the hospital to assist the doctor. All of the equipment used in the operation was owned, maintained and furnished by the hospital. In the room where this operation was performed, there was a central operating room light consisting of multiple bulbs over the operating table. The hospital also had available for use six portable lamps or lights which could be moved to any operating room. It was the duty of the circulating nurse to handle the supplies and to get any needed supplies.

The operation on Furlong is described as a left femoral saphenous bypass on the left leg, performed after a series of tests wherein it was concluded that he was suffering from a femoral artery occlusion. The operation consisted of the removal of the saphenous vein and the substitution of the vein for the artery by way of a bypass. When the operation was started, nothing unusual was noted about his left leg. There were no ulcerations or broken skin anywhere on that member. An incision was made high on the inside of the left thigh near the groin crease, and the incision extended down the medial thigh in a curving fashion to the middle of the knee. Through this opening the saphenous vein was removed. The ends of the vein were then communicated with the artery at the abdominal crease and at the knee.

Furlong was anesthetized for approximately five hours for the operation, which lasted for about four and one-half hours. Shortly after the operation commenced a portable lamp was brought into the operating room for additional illumination, and it remained in use until the operation was concluded. It is this portable lamp that Furlong claims caused the burn about his knee. The portable lamp was kept about five feet away from the operative site. Defendant, the operating surgeon, was working between the patient and the portable lamp. The lamp was placed on the side of the operating table over the shoulders of the operating team to allow illumination of the popliteal area. The defendant was at all times sterile, wearing gown and gloves, and he did not touch or handle the portable lamp which was not sterile. The operating room was air-conditioned and none of those present felt any increased heat or warmth during the operative procedure.

Plaintiffs' witness, George Moll, systems engineer for American Sterilizing Company, described the portable lamp as a Model APX Portable Explosion Proof Lamp sold to the Barnes Hospital by American Sterilizing Company. It weighs 100 to 150 pounds, is about 15 and three-quarters inches across and has a mottled multi-surface glass on the front of it which would cause beams of

light to be thrown in every direction. The reflection from the bulb in the lamp is back against the top of the lamp from which the reflection comes. There is a center piece in the middle of the lamp which would cause it to make a dark spot in the center of any lighted area on an object held close to the lamp. Witness Moll also stated, "The lamp was so constructed that in order to burn anybody from five feet away you are going to burn four and a half feet of him, a great big spot; that you can't burn a little spot because you have a dark spot in the middle. The prime reason for this kind of a lamp is that light comes from different directions, is blown up and filtered in from lots of directions." The lamp has a single light bulb with this reflector and is designated for use with a GE 100 watt bulb, 21/4 spotlight service inside frost. When it was inspected by Moll seven days after the operation in the office of Florence Maze, supervisor of the operating room at Barnes Hospital, there was found in the lamp a GE 150 watt bulb P/25/10 spotlight service inside frost.

The evidence in regard to the condition of plaintiff's knee was as follows: Following the operation and in the recovery room, Dr. Kane noted that there was some erythema and mottling of the skin about the knee. The defendant at that time noticed that this skin was discolored, and he told Helen Furlong that the skin "was discolored, red, and it had the same appearance as a burn." Helen Furlong testified that the defendant, in her husband's room the evening following the operation, stated to her, "As good as we can figure it out, it is a burn." Byrd Furlong testified he heard defendant tell Helen Furlong that "The lamp blistered my knee." Dr. Kane testified in his deposition read in evidence that after noticing the mottling of the skin at the knee in the recovery room he gave consideration as to how this could have occurred. The possible causes, according to him, varied from thermal burn to the idea of devascularization. He thought a possibility that should be ruled out was "too hot a light." He felt that the light should be checked at the time Furlong was taken from the operating room and said, "The operating room supervisor was notified and the circulating nurse and Dr. Stokes discussed it being examined." The operating room nurse, Florence Maze, testified following the operation she heard some talk about an area on Furlong's leg. She then questioned what was used in that particular room and she testified, "and the light was one thing that had been used, a portable light, so we checked the portable light." Mrs. Maze was asked, "Did you or did you not say to the people from the American Sterilizer Company who checked the lamp after the operation, that Dr. Stokes advised you as follows: The patient was having a leg operation, the doctor reported light being hot," to which she answered, "Yes." Later on, when substantially the same question was asked of her, she stated, "I couldn't have said that." The hospital record, which was in evidence, disclosed on the date Furlong was discharged, this notation, "Sutures out, wound, except for burn, well healed, doing well." The discharge summary contained the following, "complications, other, burn on left knee by operating room light." The summary was signed by an intern, Robert L. Fulton, and by Dr. Kane. Dr. Kane admitted that he signed his name to the discharge summary, but at the time of his deposition he couldn't say whether that was his opinion at time of discharge. He testified that he did not feel one hundred percent sure, that it was either a thermal burn or resulted from devascularization from collateral vessels. Dr Fulton was not present during the operation and did not testify.

Plaintiffs' theory throughout this case is that Furlong's knee was burned by the portable lamp used by defendant during the operation because it was equipped with a stronger bulb than was called for by the manufacturer. Plaintiffs do not contend that the operation to correct the femoral artery occlusion was unsuccessful nor that the defendant failed to use the necessary skills required in its performance. This case,

therefore, does not fall within the category of a malpractice action against a physician.

In their appeal, plaintiffs contend that the facts in the record warrant the submission of this case to a jury under the res ipsa loquitur doctrine. In the alternative, they assert that if the res ipsa loquitur doctrine is not applicable, then this case should have been submitted to the jury on general negligence established by circumstantial evidence.

■ In McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641, the required elements for submission under the res ipsa loquitur doctrine are stated: "In general and on principal the doctrine of res ipsa loquitur does not apply except when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. 5 Wigmore on Evidence (2d Ed.) § 2509, p. 498; L.R.A.1917E, p. 7, note; 45 C.J. §§ 768–781, pp. 1193–1214." The requirement with respect to control may refer to right of control as well as actual control. McCloskey v. Koplar, supra, 1. c. 560.

■ One of the essential elements necessary for a case to be submissible to a jury under the doctrine of res ipsa loquitur is that the defendant had the control of or right (and duty) of control of the instrumentality causing the injury. In Maybach v. Falstaff Brewing Corp., 359 Mo. 446, 222 S.W.2d 87, 1. c. 90, it was also stated: "An essential element of the res ipsa loquitur doctrine is that the proof of the occurrence and attendant circumstances shall point, prima facie, to negligence on the part of the defendant. Such proof cannot, without further proof, point to the negligence of a defendant who is entirely out of control of the instrumentality at the time it causes injury. Such proof may tend to indicate negligence on the part of *someone,* but further proof is necessary to definitely fix the blame on the defendant by excluding causes for which he is not responsible." In the present case, the lamp that was used did not belong to the defendant, but was owned and maintained by the hospital, as was all of the other equipment in the operating room. In reply to the question, "Doctor, suppose while your hands were there over the operative site you felt unusual heat, and there was a lamp right there, would you do something about that?" the defendant stated, "If I thought it was abnormal I certainly would, yes." This statement by the defendant, when considered with the uncontradicted testimony in the case that no one in the room felt any increased heat or warmth during the operation, would not have enough probative force to establish control, right of control or duty to control the lamp.

In the case of Stafford v. St. Clair's Hospital, 19 Misc.2d 710, 189 N.Y.S.2d 351, cited by the defendant, an almost identical situation was considered. The action was against the hospital, the surgeon and the manufacturer of the lamp. It was held that the hospital was guilty of negligence since they had several months' notice of the defective condition of the lamp used and the surgeon noticed that the room was warmer than usual but continued the operation. After the surgical drapes were removed, he discovered the patient's arm was burned. The ruling of the Court in regard to the liability of the surgeon, Dr. Turel, was, 1. c. 353: "No proof was adduced at the trial to show that the operative procedure followed by Dr. Turel was other than that customarily utilized for the surgical intervention required. As the surgeon in charge of the operation Dr. Turel concentrated on the task before him. Even slight deviation from his primary concern could cause unfortunate effects. Though aware that the room was unnecessarily warm, Dr. Turel in sterile surgical attire and wearing rubber gloves which are heat resistant could not feel the effects of a constant beam of light nor could he see the area of the burn since it was encumbered by the surgical drapes. No negligence attaches to him."

■ We agree with the reasoning of the New York Court. Dr. Stokes should not be charged with a duty that is not his. To apply the doctrine of res ipsa loquitur to the facts of this case would mean that a surgeon has the duty to examine all of the equipment furnished by a hospital required for an operation, even though he had no ownership interest in the hospital or the equipment used. This would be placing a burden of more than ordinary care upon such a surgeon and this defendant. Wilt v. McCallum, 214 Mo.App. 321, 253 S.W. 156. The doctrine of res ipsa loquitur should not be applied to the facts in this case.

■ We cannot agree with plaintiffs that the evidence as to what occurred makes a submissible case on res ipsa loquitur or on the basis of circumstantial evidence of general negligence.

■ There was no direct evidence in this case that the lamp could have caused the burn to Furlong's left knee. The plaintiffs produced expert witness, George Moll, and are therefore bound by his uncontradicted evidence. Reece v. Reed, Mo., 326 S.W.2d 67. A review of the testimony of witness Moll, when considered with all of the evidence in the case, does not show that the lamp could have caused the burn. In fact, the evidence, instead of tending to prove plaintiffs' theory, points to the contrary. We find no evidence in the case that the lamp was closer than five feet from Furlong's knee at any time during the operation. From the exhibits introduced in evidence, it could be determined that the operation involved an area 15 to 18 inches in length extending from the knee to the abdominal crease, and that the area of the knee involved is only four to five inches in diameter. The surface of the lamp is over 15 inches in diameter and, at a distance of five feet, it would cover an area four and a half or five feet in diameter. The light was diffused over that area, not a small spot. Therefore, it could not have caused a burn in only a small area. A jury could not under these facts, without indulging in guesswork and speculation, find that the lamp caused the condition to the knee. The evidence which we are confronted with here leaves no other conclusion except that the injuries suffered could not have happened as theorized by plaintiffs.

■ Plaintiffs further urge that the testimony of Mrs. Maze in quoting defendant, "that the light was hot" should be considered in placing liability upon defendant. The record in the case does not disclose when that statement was made, either during or after the operation; nor if true, does it give us any information as to how close the defendant was to the lamp at the time the statement was made. It is common knowledge that an electric light bulb will generate heat. However, in this case it is plaintiffs' theory that the use of a 150 watt bulb in the lamp, when it called for a 100 watt bulb, was the negligent act which caused this burn. There is no evidence in this case as to what the effect might have been from the use of a light bulb of higher wattage than recommended or prescribed by the manufacturer when used as in this case. Examining plaintiffs' theory on this point, they are saying that the use of the improper light bulb in the lamp was the cause of the burn, and in so doing, we must logically conclude that the use of the proper light bulb would not have caused the burn. For a jury to reach the conclusion that the 150 watt bulb in the lamp caused the burn, without some direct evidence, would call for speculation and guesswork.

In our examination of all the facts in the plaintiffs' case and in considering the relationship of the defendant to the hospital and the defendant to the lamp, we must conclude that the plaintiffs have failed to make a submissible case to be submitted to the jury on either of their theories.

We have considered other cases cited but have not discussed them in the opinion and do not find anything in them to cause us to reach a different conclusion.

Plaintiffs have also contended in their appeal that defendant's spoliation of hospital records permits the inference that Furlong's knee was burned by the operating room light, citing Garrett v. Terminal Railroad Association of St. Louis, Mo., 259 S.W. 2d 807, and Black's Law Dictionary, 4th Edition, page 1573. In Garrett v. Terminal Railroad Association of St. Louis, plaintiff, an employee, destroyed the original of an order made by defendant company. This court held that where a party to a suit has been guilty of spoliation of documentary evidence he is held to thereby admit the truth of the allegation of the opposite party. "Spoliation" as defined in Black's Law Dictionary is "Destruction of a thing by the act of a stranger, as the erasure or alteration of a writing by the act of a stranger." The hospital record made by Dr. Sasser, intern, on Furlong's readmission to the hospital for a skin graft to the lesion on his knee showed "burn area, 3° LT Medial thigh (old)." Defendant wrote over this "ulcer of left knee, medial aspect." It is apparent that a change was made in the record, but it is not the same as destroying the record, or the same as alteration or erasure intended to obliterate completely that which was there before. This act, therefore, could not be characterized as spoliation. The result of the Garrett decision was that defendant was held to have admitted that the words "and flat wheels" were not on the original bad order card, not that the car had flat wheels. Here, at most, defendant would be held to admit that the record originally said "burn" rather than "ulcer," not that plaintiff Furlong actually had a burn. However, even with this admission by defendant, the plaintiffs have failed to carry the burden of making a submissible case for the jury.

The judgment is affirmed.

FINCH, P. J., and EAGER, J., concur.

DONNELLY, J., not sitting.